## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

ANDRE AZIH,

      Plaintiff,

v.

ACELLA PHARMACEUTICALS, LLC,
a Delaware company,

and

MICHAEL GOLD, individually,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

The Plaintiff, Andre Azih ("Azih"), by and through his undersigned counsel from HKM Employment Attorneys, LLP, as his Complaint and Jury Demand against Acella Pharmaceuticals, LLC, a Delaware company ("Acella") and Michael Gold, individually ("Gold") (collectively, "Defendants") states as follows:

### INTRODUCTION

1.      Azih is an African-American citizen who was the top salesperson at Acella during most of his employment. On August 5, 2020, the Defendants terminated Azih's employment under circumstances that indicate that the decision was unlawful.

2.      First, the Defendants terminated Azih because of his race (African-American) and color (Black) in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"),

Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), and the Colorado Anti-Discrimination Act ("CADA"). Acella is liable for this discrimination, and for the damages Azih has experienced as a result thereof.

3.      Second, the Defendants terminated Azih because he engaged in communications that were protected by the statutory provisions and public policies of the Colorado Wage Act, C.R.S. § 8-4-101 et seq. ("Wage Act"). Specifically, Gold terminated Azih because he complained about the Defendants' failure to pay wages and compensation that was due to Azih and other salespeople. As such, Acella is liable for wrongful termination in violation of public policy, and both Defendants are liable for negligence *per se*. *See* C.R.S. § 8-4-120.

4.      Third, the Defendants terminated Azih because he engaged in communications and conduct that were protected under Colorado's Public Health Emergency Whistleblower Law, C.R.S. § 8-14.4-101 et seq. ("PHEW Law"). Specifically, he opposed, resisted, and objected to efforts by the Defendants to force Azih and other salespeople to make unnecessary, unsafe, in-person sales calls to medical facilities during the height of the global COVID-19 pandemic. *See* C.R.S.§ 8-14.4-102. Accordingly, both Defendants are liable for retaliation in violation of the PHEW Law.

5.      The Defendants further violated the PHEW Law by seeking to force Azih to sign an agreement that would have prevented him from disclosing information about the Defendant's "workplace health and safety practices or hazards related to a public health emergency." *See* C.R.S.§ 8-14.4-102(2)(a). Such conduct constitutes an adverse action in violation of the PHEW Law. C.R.S.§ 8-14.4-102(2)(b).

6.      The Defendants also violated the Colorado Wage Act by failing to pay Azih bonuses that he earned during the second quarter of 2020, and failing to provide him with a trip to St. Lucia (or the cash value of the trip) that he was promised as the winner of the President's Club Award, which he received for being the top salesperson during 2019. The Defendants owe Azih these wages and compensation, along with statutory penalties under C.R.S. § 8-4-109(3), and reasonable attorneys' fees and costs. Alternatively, Azih seeks payment of this compensation under the common law doctrine of promissory estoppel.

7.      Based on the Defendants' unlawful conduct, Azih seeks declaratory and injunctive relief, reinstatement or front pay, actual damages, back pay, statutory damages, compensatory damages, punitive damages, exemplary damages, reasonable attorney's fees and costs under Title VII, Section 1981, CADA, the PHEW Law, and Colorado common law.

## PARTIES

8.      Plaintiff Andre Azih ("Azih") is a citizen of Colorado whose attorneys, HKM Employment Attorneys LLP, are located at 730 17th Street, Suite 750, Denver, Colorado 80202. At all times relevant to this Complaint, Azih was an "employee" protected by state and federal law. *See* C.R.S. §§ 8-4-101(5), 8-14.4.-101(5); 42 U.S.C. § 2000e(f).

9.      Defendant Acella Pharmaceuticals, LLC ("Acella") is a Delaware company that is primarily engaged in the pharmaceuticals business through sales representatives that sell drugs such as NP Thyroid and Glopberba to medical offices and practitioners. Its principal place of business is 1880 McFarland Parkway, Suite 110, Alpharetta, Georgia, 30005. This Complaint is being served on Acella through its attorneys at Wilson Elser Moskowitz Edelman & Dicker LLP, who are located at 1225 17th Street, Suite 2750, Denver, Colorado 80202.

10.     At all times relevant to this Complaint, Acella was an "employer," as defined by state and federal law. *See* C.R.S. § 8-4-101(6); 42 U.S.C. § 2000e(b).

11.     Defendant Michael Gold is a citizen of Arizona, who is being served with this Complaint through his attorneys at Wilson Elser Moskowitz Edelman & Dicker LLP, who are located at 1225 17th Street, Suite 2750, Denver, Colorado 80202.

12.     At the time of Azih's termination in August 2020, Gold was an "employer" as defined by the Colorado Wage Act and the PHEW Law. *See* C.R.S. § 8-14.4-101(3)(a) (incorporating definition of "employer" from the Fair Labor Standards Act ("FLSA")); *see also Koellhoffer v. Plotke-Giordani*, 858 F. Supp. 2d 1181, 1189–90 (D. Colo. 2012) (discussing "economic reality test" used to establish whether individual is an "employer" under the FLSA).

## JURISDICTION AND VENUE

13.     Azih incorporates the allegations in the above paragraphs as if fully set forth herein.

14.     This Court has subject matter jurisdiction over Azih's claims brought under Title VII and Section 1981 pursuant to 28 U.S.C. 1331 because those claims arise under federal law.

15.     The Court may exercise supplemental jurisdiction over Azih's claims brought under Colorado law pursuant to 28 U.S.C. § 1367 because those claims are so related to Azih's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Azih's claims occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

17.     Azih incorporates the allegations in the above paragraphs as if fully set forth herein.

18.     On or around December 16, 2020, Azih timely filed a Charge of Discrimination with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of race and color, which was processed as CCRD Case No. E200010748 and EEOC Charge No.32A-2021-00234.

19.     On July 9, 2021, the CCRD issued Azih a Notice of Right to Sue. This Complaint is being filed within 90 days of Azih's receipt of that Notice.

20.     On or around December 9, 2020, Azih filed a timely Complaint with the Colorado Department of Labor and Employment, Division of Labor Standards and Statistics ("DLSS"), alleging violations of the PHEW Law. The Complaint was processed as Claim No. 4717-20.

21.     On June 11, 2021, the DLSS issued Azih a Notice of Right to Sue and Exhaustion of Administrative Remedies. This Complaint is being filed within 90 days of Azih's receipt of that Notice.

## FACTUAL ALLEGATIONS

22.     Azih incorporates the allegations in the above paragraphs as if fully set forth herein.

23.     Acella is a Delaware company that does business in Colorado and employs more than 200 people.

24.     At all times relevant to this Complaint, Gold was employed by Acella as its District Sales Manager ("DSM").

25.     As DSM, Gold had the power to hire and fire employees, as evidenced by the fact that he terminated Azih on August 5, 2020.

26.     At all times relevant to this Complaint Gold had ultimate control over the terms and conditions of Azih's employment, including the hours he worked, the tasks he was required to perform, and the wages and compensation he was paid.

27.     Gold often micro-managed Azih and the other salespeople at Acella, maintaining constant contact with them through managerial e-mails, phone calls, and text messages. He also had control over the rate and method of payment of Azih's wages and compensation.

28.     On information and belief, Gold was also the individual at Acella who was primarily responsible for maintaining records related to Azih's employment, including his hiring, performance, discipline, and compensation.

### *Azih's Qualifications and Job Performance*

29.     Azih was hired by Acella to work as a sales representative on or around January 16, 2018.

30.     As a sales representative, Azih was entitled to an annual salary of $45,000.00, plus bonuses each quarter if he met or exceeded his sales goals.

31.     Under the Bonus Plan that was in effect at Acella during the second quarter of 2020, Azih and the other sales representatives earned bonuses of between $7,000 and $9,114.00 if they met or exceeded their goals for sales of NP Thyroid. In addition, they were promised that they would receive a "Bounty" of between $30 and $40 for each sale on Glopberba.

32.     The sales representatives were also promised that they would receive a $2,500.00 bonus if they were the market share leader, which Azih was.

33.     Throughout his employment, Azih's job performance was outstanding. He consistently met or exceeded all of the sales goals that were presented to him.

34.     During every quarter in 2019, Azih was the #1 sales representative in the company, surpassing every company target and achieving the coveted President's Club Award.

35.     As a recipient of the President's Club Award, Acella promised Azih a trip to St. Lucia. This trip was eventually postponed due to the outbreak of COVID-19, and Azih did not ever receive the trip he was promised, or any compensation to account for the fact that Acella broke its promise.

36.     During his employment, Azih was the only African-American in Acella's sales force of about 200 employees.

37.     Azih was also one of the only Black employees at the company, which is headquartered in Atlanta, Georgia (a city that is more than 50% Black) and has approximately 500 employees.

38.     Unlike most of the sales representatives who work at Acella, Azih has a graduate degree that is pertinent to the pharmaceuticals industry, having received his Doctorate of Pharmacy from Colorado's prestigious Regis University.

39.     Despite Azih's exceptional performance and qualifications, Acella consistently treated him less favorably than other, white employees.

40.     For example, the company promoted Gold, who was hired at the same time as Azih but lacked his education and skills, to be Azih's DSM.

41.     Like the rest of the salespeople at Acella, Gold is white.

42.     Throughout Azih's employment, Gold was a poor manager who had an unusual amount of turnover among his subordinates.

43.     As a result of Gold's incompetence, several of Azih's teammates communicated with Azih, instead of Gold, when they needed advice or direction.

44.     Even after Azih proved himself to be the top performer at Acella, the company promoted other, white sales representatives instead of Azih.

45.     During a candid conversation in 2018, DSM Josh Warbolosky shed light on Acella's bias in favor of white employees, admitting to Azih that it was a "tough decision" to hire him over a far less qualified applicant who had "blonde hair, blue eyes, and large breasts." In other words, the Company preferred attractive white sales representatives over Black or African-American applicants.

46.     After hearing this, Azih reviewed the LinkedIn profiles of Acella's employees and confirmed that the other salespeople at Acella were all white, and mostly blonde women.

47.     Acella's bias against African-Americans and Black people was further demonstrated by Gold's reaction to Azih's surpassing of all of his goals during 2019 and the first quarter of 2020.

48.     Instead of expressing gratitude for Azih's efforts and contributions, Gold wrote him a scathing performance review for 2019 (the year Azih was the #1 salesperson) and issued him a "Warning Letter" that was entirely unwarranted.

49.     In the performance review, Gold accused Azih of being "unprofessional," not "work[ing] a full day," and "not "speak[ing] clearly" – all falsehoods that reveal much more about Gold's prejudices against African-Americans and Black people than Azih's stellar sales record.

***Azih's Wage Complaint***

50.     On May 1, 2020, Gold held a telephone conference with Azih and the other salespeople who worked on his team.

51.     During that meeting, Azih expressed concern with Acella's failure to pay the bonuses that were due to its salespeople for their work in the first quarter of 2020.

52.     As of date of the phone meeting, none of the salespeople had received their bonuses.

53.     Azih reminded Gold that the representatives were entitled to receive both a base salary of around $45,000.00 *and* bonuses for their work each quarter, and that the company's failure to pay earned bonuses was creating hardships for him and the other salespeople.

54.     Azih told Gold, "We are sales reps and don't aspire to work for our base salary."

55.     Following the May 2020 meeting, Gold called and e-mailed Azih to chastise him for "embarrassing" him during the phone conference.

56.     Gold then repeated his prior accusation that Azih was "aggressive" – a stereotype Gold apparently holds very firmly regarding Black men.

57.     Acella has admitted in filings with the CCRD that Azih's statements during the phone conferences on May 1, 2020 were one of its bases for terminating his employment.

***The Public Health Emergency of COVID-19***

58.     When the Coronavirus/COVID-19 pandemic struck the United States in the Spring and Summer of 2020, Azih and Acella's other sales representatives began to work remotely.

59.     Because of the pandemic, Acella postponed Azih's trip to St. Lucia, which he had been promised for winning the President's Club Award, twice.

60.    Throughout 2020, Azih continued to satisfy all of the company's requirements, meeting all of his goals and targets. As a result, during a phone call with Azih in June 2020, Gold acknowledged that Azih's performance numbers "look[ed] good."

61.    The pandemic was and continues to be one of the worst virus outbreaks in history. As of the date of this Complaint, COVID has infected more than 194 million, and killed more than 4 million, people worldwide.

62.    To date, the virus has infected more than 34 million, and killed more than 600,000, people in the United States.

63.    As of the date of this Complaint, COVID-19 has infected more than 570,000, and killed more than 7,000, people in Colorado.

64.    Due to the outbreak of the pandemic in the Spring and Summer of 2020, Azih was concerned that visiting medical facilities in person would create undue risks of infection, illness, and even death for himself and the members of the public with whom he came in contact.

65.    Azih was aware that the federal Center for Disease Control ("CDC") and the state and local governments in Colorado had instructed citizens to stay at home whenever possible, and to avoid unnecessary interactions that might spread COVID-19. These measures were intended to protect the health and safety of everyone in the United States.

66.    Azih was also aware that state and local governments had ordered businesses and their employees to perform from home and/or virtually all operations and tasks that could reasonably be performed by those means.

67.     At all times relevant to this Complaint, Azih's duties as a sales representative for Acella could reasonably be performed remotely. For this reason, most of the other large pharmaceutical companies in the U.S. had their salespeople working remotely.

68.     Gold flouted the orders of the CDC and the state and local governments by continually pressuring Azih and the other representatives on his team to make in-person, onsite visits to medical facilities instead of working from home.

69.     In the early Summer, Azih received a phone call from another Acella sales representative who said that he was fearful for his safety because he knew that Gold had forced two other salespeople to resume making onsite visits.

70.     The representative told Azih that he was not comfortable confronting Gold about this issue.

71.     The representative also informed Azih that Gold had previously contracted the COVID-19 virus, and that Gold did not disclose that fact to his subordinates and even continued having close personal contact with them.

72.     Azih believed that Gold, and through him, Acella, were breaking the law by attempting to force him and other sales representatives to perform in-person visits.

73.     Azih further believed that the Defendants' actions posed a significant threat to his health and safety, and to the health and safety of the clients and potential clients with whom he worked.

74.     Based on his understanding of the laws in effect, the health and safety risks posed by the pandemic, and the specific dangers associated with unnecessary in-person visits, Azih continued to work virtually during the Spring and Summer of 2020.

75.     Azih opposed Gold's attempts to force employees to engage in unsafe, in-person visits during phone calls and e-mail correspondence with Gold during the Summer of 2020.

76.     In a July 6, 2020 e-mail, Gold chastised Azih for refusing to make in-person visits, claiming that Azih was demonstrating that he did not want to "thrive" at the company and was making "excuses as to why not go back in the field."

77.     He indicated that the pandemic was an ideal time to visit medical offices precisely because Acella's competitors were not doing so.

78.     Azih resisted Gold's undue pressure and told him that he wanted to "push business forward with regard to office protocols and safety for all."

79.     Based on his belief that in-office visits were not safe or healthy during the Spring and Summer of 2020, Azih continued to work remotely.

### *Azih's Termination*

80.     On August 5, 2020, Gold and Acella's Vice President of Human Resources, Meenal Rathi ("Rathi"), called Azih on the phone and told him that his employment was terminated because he was "underperforming" and because he was not a good "fit" for Acella.

81.     Azih saw the performance numbers and rankings of Acella's salespeople throughout 2020, and knew that he was performing better than many of the white salespeople.

82.     Additionally, Gold had recently told Azih that his performance numbers "looked good." As such, Azih knew that his performance was not the real reason for his termination.

83.     Prior to his termination, Azih had exceeded his sales goals in the first and second quarters of 2020.

84.     Nevertheless, Acella did not pay Azih any bonus at all for the second quarter.

85.     Acella currently owes Azih approximately $10,000.00 for the bonus he earned in the second quarter of 2020.

86.     In August 2020, Acella's Vice President, Rathi sent a letter to Azih requesting that he sign an "Employment Separation Agreement and Release of Claims" ("Release") in order to receive his final wages.

87.     The Release sought to require Azih to agree not to "make statements… that can be construed as critical of or derogatory to the Company" (which would necessarily include a complaint to any government agency) and to affirm that "the Separation stated in this Agreement is voluntary, non-discriminatory, and unrelated to Employee's age, race, color, ethnicity," etc.

88.     Azih refused to sign the Release.

89.     On August 12, 2020, Azih sent Rathi an e-mail informing her that under Colorado law, he was entitled to his earned wages whether or not he signed the Release, and demanding that his bonus and the cash value of the St. Lucia trip be immediately paid to him.

90.     Rathi responded by telling Azih that the company would pay him *half* of his bonus and the cash value of the trip, but only if he signed the Release, which Azih refused to do.

91.     To date, Acella has still not paid Azih all of his earned wages and compensation.

92.     More than 14 days have passed since Acella received Azih's wage demands.

93.     Through this Complaint and pursuant to C.R.S. § 8-4-109. Azih again demands the immediate payment of the $10,000.00 bonus he earned and the cash value of the St. Lucia trip, which he estimates to be $10,000.00.

94.     Upon terminating Azih, the Defendants replaced him with a white salesperson named Miranda Gingold.

# COUNT I

## DISCRIMINATION BASED ON RACE AND COLOR
## IN VIOLATION OF TITLE VII

### 42 U.S.C. § 2000e et seq.

### *Against Acella*

95.     Azih incorporates the allegations in the above paragraphs as if fully set forth herein.

96.     At all times relevant to this Complaint, Azih was an "employee" as defined by 42 U.S.C. § 2000e(f).

97.     At all times relevant to this Complaint, Acella was an "employer" as defined by 42 U.S.C. § 2000e(b).

98.     Title VII makes it "an unlawful employment practice for an employer […] to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of an individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e—2(a)(1).

99.     Azih belongs to protected classes under Title VII, in that he is African-American and Black.

100.    At all times during his employment, Azih was qualified for his job and performed his duties in accordance with Acella's legitimate expectations.

101.    Azih met all of his sales goals in 2020, as required by Acella, and his performance exceeded that of other, white salespeople who retained their jobs after Gold terminated Azih.

102.    Acella subjected Azih to adverse actions by promoting Gold and other employees who were less qualified than Azih to the position of DSM instead of Azih, by subjecting Azih to an unwarranted write-up that was based on Gold's racist stereotypes of Black people, by

terminating Azih's employment on August 5, 2020, and by seeking to force Azih to sign a release falsely affirming that his termination was "voluntary, nondiscriminatory, and unrelated to [Azih's] age, race, color, ethnicity."

103.    Azih's job position was not eliminated after his termination. Instead, his job was given to a white sales representative named Miranda Gingold.

104.    The adverse actions of Acella were based on Azih's race and color, as demonstrated by the fact that other, white salespeople were not subject to such treatment. Accordingly, such actions violated Title VII.

105.    As a direct and proximate result of Acella's actions, Azih has suffered loss of income, emotional pain and suffering, embarrassment, and inconvenience. He is therefore entitled to general and special damages, economic damages, and reasonable attorneys' fees and costs.

106.    Because the Defendants' violations of Azih's rights were willful and reckless, Azih is also entitled to punitive damages.

## COUNT II

### DISCRIMINATION BASED ON RACE AND COLOR IN VIOLATION OF SECTION 1981

### 42 U.S.C. § 1981

#### *Against Both Defendants*

107.    Azih incorporates the allegations in the above paragraphs as if fully set forth herein.

108.    42 U.S.C. § 1981 prohibits discrimination in the making and enforcement of contracts and is designed to provide a remedy against discrimination in employment on the basis of race, ancestry, and/or ethnic traits.

109.    On or around January 16, 2018, Acella entered into a contract with Azih that is subject to Section 1981.

110.    The Defendants discriminated against Azih in violation of Section 1981 by promoting less-qualified employees instead of Azih, by subjecting Azih to an unwarranted write-up, by terminating Azih's employment on August 5, 2020 under circumstances where white sales representatives were treated more favorably, and by seeking to force Azih to sign a release falsely affirming that his termination was "voluntary, nondiscriminatory, and unrelated to [Azih's] age, race, color, ethnicity."

111.    The Defendants treated Azih less favorably than other salespeople because of his race and color.

112.    The unlawful employment practices complained of above were intentional and were committed with malice or with reckless indifference to Azih's federally-protected rights.

## COUNT III

### DISCRIMINATION BASED ON RACE AND COLOR
### IN VIOLATION OF CADA

#### *Against Acella*

113.    Azih incorporates the allegations in the above paragraphs as if fully set forth herein.

114.    At all times Relevant to this Complaint, Azih was an "employee" as defined by C.R.S. § 24-34-401(2).

115.    At all times Relevant to this Complaint, Acella was an "employer" as defined by C.R.S. § 24-34-401(3).

116.    CADA prohibits employers from discharging or otherwise retaliating against any employee "because of… race, creed, color, sex, sexual orientation, religion, age, national origin, or ancestry." C.R.S. § 24-34-402(1)(a).

117.    Azih belongs to protected classes under CADA because he is African-American and Black.

118.    At all times during his employment, Azih was qualified for his job and performed his duties in accordance with Acella's legitimate expectations.

119.    Acella violated CADA by subjecting Azih to adverse actions to which it did not subject its white employees, including promoting less qualified employees over Azih, subjecting Azih to an unwarranted write-up, terminating Azih's employment on August 5, 2020, and seeking to force Azih to sign a release falsely affirming that his termination was not the result of race discrimination.

120.    After terminating Azih, Acella replaced him with a white salesperson.

121.    As a direct and proximate result of Acella's actions, Azih has suffered loss of income, emotional pain and suffering, embarrassment, and inconvenience. He is therefore entitled to general and special damages, economic damages, and reasonable attorneys' fees and costs.

122.    Azih also reserves the right to seek exemplary damages at the appropriate time in this action.

## COUNT IV

### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

### *Against Acella*

123.    Azih incorporates the allegations in the above paragraphs as if fully set forth herein.

124.    Azih was employed by Acella from January 16, 2018 to August 5, 2020.

125.    The Colorado Wage Act clearly expresses public policies of requiring employers to timely pay wages earned by employees. C.R.S. § 8-4-103.

126.    In addition, the Act expresses public policies against discriminating against and terminating employees for complaining about an employer's failure to pay wages that are due. C.R.S. §§ 8-4-120.

127.    In May 2020, Azih complained to Gold, and through him, Acella, that the company was not paying the bonuses earned by sales representatives in accordance with their agreements. In doing so, Azih was exercising a job-related right.

128.    Acella terminated Azih's employment on August 5, 2020 because of his complaints. In doing so, the Defendant retaliated against Azih in violation of the public policies that are clearly expressed in the Colorado Wage Act, and undermined those policies.

129.    Because Acella's termination of Azih was wrongful, the company is liable to Azih for actual damages and compensatory damages.

130.    Azih also reserves the right to seek exemplary damages at the appropriate time in this action based on the willfulness and recklessness of Acella's conduct.

## COUNT V

### NEGLIGENCE *PER SE*

### *Against Both Defendants*

131.    Azih incorporates the allegations in the above paragraphs as if fully set forth herein.

132.    C.R.S. § 8-4-120 declares:

No employer shall intimidate, threaten, restrain, coerce, blacklist, discharge, or in any manner discriminate against any employee who has filed any

complaint or instituted or caused to be instituted any proceeding under this article or related law or who has testified or may testify in any proceeding on behalf of himself, herself, or another regarding afforded protections under this article.

133.    The Wage Act thus defines a standard of care that is and was applicable to the Defendants.

134.    As an employee working in Colorado, Azih was a member of the class of persons that was intended to be protected by C.R.S. § 8-4-120.

135.    The Defendants breached the duties they owed to Azih under C.R.S. § 8-4-120 by terminating his employment for complaining about their failure to pay his wages, thus committing negligence *per se*.

136.    The injuries Azih suffered as a result of the Defendants' breach are precisely the type of injuries C.R.S. § 8-4-120 was enacted to prevent.

137.    Due to the Defendants' negligence, they are liable to Azih for the damages he suffered, including compensatory damages.

138.    Azih also reserves the right to seek exemplary damages against the Defendants at the appropriate time in this action.

## COUNT VI

### RETALIATION IN VIOLATION OF THE PHEW LAW

### C.R.S. § 8-14.4-102(1), (4)

### *Against both Defendants*

139.    Azih incorporates the above paragraphs as if fully set forth herein.

140.    At all times relevant to this Complaint, Acella was a "principal" covered by the PHEW Law. C.R.S. § 8-14.4-101(3).

141. At the time of Azih's termination, Gold was also a "principal" because he exercised a high level of operational control over Acella and Azih's employment. *See* C.R.S. § 8-14.4-101(3)(a); *Koellhoffer*, 858 F. Supp. 2d at 1189–90.

142. At all times relevant to this Complaint, Azih was a "worker" covered by the PHEW Law. C.R.S. § 8-14.4-101(5); C.R.S. § 8-4-101(5).

143. Under C.R.S.§ 8-14.4-102:

(1) A principal shall not discriminate, take adverse action, or retaliate against any worker based on the worker, in good faith, raising any reasonable concern about workplace violations of government health or safety rules, or about an otherwise significant workplace threat to health or safety, related to a public health emergency to the principal, the principal's agent, other workers, a government agency, or the public if the principal controls the workplace conditions giving rise to the threat or violation.

…

(4) A principal shall not discriminate, take adverse action, or retaliate against a worker based on the worker opposing any practice the worker reasonably believes is unlawful under this article 14.4 or for making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing as to any matter the worker reasonably believes to be unlawful under this article 14.4.

144. Azih engaged in protected activity under the PHEW law when he raised good faith, reasonable concerns about the Defendants' failure to abide by the orders of the CDC and the state and local governments.

145. Azih engaged in protected activity by raising reasonable concerns about Gold's attempts to force him and other Acella employees to make onsite visits to health and medical facilities during the COVID-19 pandemic.

146.   Azih also engaged in protected activity by opposing Gold's efforts to force him and other Acella employees to make onsite visits during the pandemic, because he reasonably believed that Gold's (and thus Acella's) actions were illegal.

147.   Azih also reasonably believed that the Defendants' actions were a threat to the health and safety of himself, his coworkers, and the members of the public with whom Gold was seeking to force him to interact during the height of the pandemic.

148.   The Defendants violated the PHEW Law by terminating Azih's employment because he engaged in activities and communications that were protected under the Law. C.R.S. § 8-14.4-102(1), (4).

149.   The Defendants are therefore liable to Azih for back pay, front pay, compensatory damages, punitive damages, and reasonable attorney's fees. C.R.S. § 8-14.4-106.

## COUNT VII

### ATTEMPTING TO REQUIRE UNLAWFUL AGREEMENT IN VIOLATION OF THE PHEW LAW

### C.R.S. § 8-14.4-102(2)

### *Against Acella*

150.   Azih incorporates the above paragraphs as if fully set forth herein.

151.   Under the PHEW Law:

(2)(a) A principal shall not require or attempt to require a worker to sign a contract or other agreement that would limit or prevent the worker from disclosing information about workplace health and safety practices or hazards related to a public health emergency or to otherwise abide by a workplace policy that would limit or prevent such disclosures.

(b) A contract or agreement that violates subsection (2)(a) of this section is void and unenforceable as contrary to the public policy of this state. A

principal's attempt to impose such a contract or agreement is an adverse action in violation of this article 14.4.

C.R.S.§ 8-14.4-102

152.    Acella violated the PHEW law by attempting to require Azih to sign an agreement that would have required Azih not to "make statements… that can be construed as critical of or derogatory to the Company." Such an agreement would necessarily have prevented Azih from disclosing Gold's illegal and dangerous conduct.

153.    The Defendants are therefore liable to Azih for back pay, front pay, compensatory damages, punitive damages, and reasonable attorney's fees. C.R.S. § 8-14.4-106.

<u>COUNT VIII</u>

**FAILURE TO PAY EARNED WAGES AND COMPENSATION
IN VIOLATION OF THE COLORADO WAGE ACT**

**C.R.S. § 8-4-101 et seq.**

***Against Both Defendants***

154.    Azih incorporates the above paragraphs as if fully set forth herein.

155.    At all times relevant to this Complaint, Azih was an "employee," as defined by the Wage Act ("CWA"). *See* C.R.S. § 8-4-101(5).

156.    At the time of Azih's termination, the Defendants were "employer[s]," as defined by the CWA. *See* C.R.S. § 8-5-101(6); *see also Koellhoffer*, 858 F. Supp. 2d at 1189–90.

157.    The CWA requires employers to pay all wages earned by employees in a timely manner. C.R.S. § 8-4-103.

158.    The CWA further requires employers to immediately pay final wages to any employee who has been terminated. C.R.S. § 8-4-109.

159.    The Defendants violated the CWA by failing to pay Azih the wages and compensation he earned during his employment.

160.    At all times relevant to this Complaint, the Defendants knew or should have known that they owed, and still owe, wages and compensation to Azih.

161.    The Defendants further violated the Act by failing to pay Azih all of the wages and compensation that were due to him upon his termination.

162.    Accordingly, the Defendants are liable to Azih for unpaid wages and compensation of at least $20,000.00, plus his attorneys' fees and costs incurred in bringing this action. *See* C.R.S. § 8-4-110.

163.    Azih sent the Defendants demands for payment of his wages in August 2020. More than 14 days have passed since the Defendants received those demands, and they have not tendered the amounts that are due to Azih.

164.    Accordingly, the Defendants are liable to Azih for statutory penalties under C.R.S. § 8-4-109(3), and additional penalties based on the willfulness of their violations of the CWA.

## COUNT IX

### PROMISSORY ESTOPPEL

#### *Against Acella*

165.    Azih incorporates the above paragraphs as if fully set forth herein.

166.    Acella promised Azih payments totaling approximately $10,000.00 if he hit his sales goal in the second quarter of 2020.

167.    Acella also promised Azih a trip to St. Lucia based on his top performance in 2019.

168.     After the pandemic caused the trip to be cancelled twice, Raathi offered to pay Azih half of his bonus and the cash value of the trip, but only if he would sign a Release that contained false and illegal provisions.

169.     Acella reasonably should have expected that its promises would induce Azih to act in reliance on the promises.

170.     Azih acted in reliance on Acella's promises when he kept working for the Defendants, he met all of his targets in the second quarter of 2020.

171.     Under these circumstances, Acella's promises must be enforced to prevent injustice.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully asks the Court rule in his favor, and against the Defendants, and in addition:

A. Issue an Order declaring that the Defendants' actions complained of herein violated Colorado and federal law;

B. Issue temporary and permanent injunctions prohibiting the Defendants from continuing their violations of Colorado and federal law;

C. Award the Plaintiff his actual damages in an amount to be determined at trial;

D. Enforce Defendant Acella's promises to the Plaintiff by requiring them to pay him the amounts he was promised for the second quarter of 2020, as well as the value of the St. Lucia trip;

E. Award the Plaintiff back wages from August 5, 2020 to the date of judgment, in an amount to be determined at trial;

24

F.  Order the Defendants to reinstate the Plaintiff to his previous position, with compensation and benefits adjusted for inflation, or alternatively, award the Plaintiff front pay in an amount to be determined at trial;

G.  Award the Plaintiff compensatory damages in an amount to be determined at trial;

H.  Award the Plaintiff punitive damages in an amount to be determined at trial;

I.  Allow the Plaintiff, at the appropriate time in this action, to amend this Complaint to add claims for exemplary damages;

J.  Award the Plaintiff back wages of $20,000.00 for the Defendants' violations of the Colorado Wage Act complained of herein;

K.  Award the Plaintiff statutory penalties of $15,625.00 under C.R.S. § 8-4-109(3)(b);

L.  Award the Plaintiff statutory penalties of $7,812.50 under C.R.S. § 8-4-109(3)(c) based on the willfulness of the Defendants' violations of the Colorado Wage Act;

M.  Award the Plaintiff his reasonable attorneys' fees and costs;

N.  Order all other and further relief that the Court may find to be equitable and just.

## <u>JURY DEMAND</u>

The Plaintiff demands a jury on all issues so triable.

Respectfully submitted on this 16th day of August 2021.

/s/ Adam M. Harrison_____
Claire E. Hunter
Adam M. Harrison
HKM Employment Attorneys LLP
750 17th Street, Suite 730
Denver, Colorado 80202
720.255.0370
chunter@hkm.com
aharrison@hkm.com
*Counsel for Plaintiff Andre Azih*
